NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

16-P-336                                          Appeals Court


RALF BERGER & others[1] vs.  2 WYNDCLIFF, LLC, & others[2]
(and a companion case[3]).


No. 16-P-336.

Suffolk.     January 4, 2017. - December 5, 2017.

Present:  Maldonado, Sacks, & Shin, JJ.


Real Property, Restrictions, Covenant running with the land.



Civil actions commenced in the Land Court Department on November 1, 2013.

The cases were heard by Robert B. Foster, J., on motions for summary judgment.


Ellen Rappaport Tanowitz for Ralf Berger & others.
Mark Bobrowski for 2 Wyndcliff, LLC, & others.

---

[1] Melissa Berger, Nijan Datar, Teresa Datar, Kevin Donohoe, Frank Foley, Mary Ann Foley, Mary Haller, Kathryn Lagunowich, Mark Lagunowich, Amaro Laria, and Katharine Larsson.

[2] Robert H. Batts, Jr., trustee of the Robert H. Batts, Jr., family trust; Lexington Holdings, LLC; and water supply district of Acton.

[3] Robert H. Batts, Jr., trustee of the Robert H. Batts, Jr., family trust, & another vs. Ralf Berger & others.

MALDONADO, J.  In this case, we consider whether certain restrictions on land were legally and effectively amended to extend the time period of their enforcement or whether they had expired.  The judge concluded the restrictions had expired.  For reasons different from those relied on by the judge, we affirm the judgment.

Background.  On March 26, 1980, in the course of developing land she owned in Acton, Mabel Jenks McNiff executed an agreement of "protective covenants and easements" for the benefit of "future mortgagees, buyers, and owners of the land." The agreement was recorded, apparently on the same date.  McNiff thereafter sold off lots with the benefits and burdens of the agreement.  The parties are all owners of lots subject to the agreement.

The agreement expressly provided that the covenants are to "run with the land" and bind the parties claiming under them "for a period of thirty (30) years from the date these covenants are recorded."  The covenants limited construction on each lot to one single-family dwelling, with a two- or three-car garage, and "such other accessory structures as are commonly used as appurtenant to a single family dwelling."  The agreement provided that the covenants "may be amended or revoked, in whole or in part, by an instrument signed by two thirds or more of the then owners of the lots covered hereby, said amendment or

revocation to be effective upon recording thereof at the . . . Registry of Deeds."

More than two-thirds of the owners of the lots affected by the agreement amended the agreement in minor ways over the years, largely to alter the percentage of costs owners were required to contribute to maintain the roads.  On December 7, 2001, more than two thirds of the owners of the affected lots amended it for a fourth time to provide that the covenants are to "run with the land and be binding on all of the Lots until March 26, 2010," i.e., thirty years from the date the original agreement was recorded.  The amendment then provides, "Thereafter, these Protective Covenants and Easements may be extended for further periods of not more than twenty (20) years at a time by owners of record, at the time of recording of the extension, of two-thirds (2/3) or more of the Lots and also comprising fifty percent . . . or more of the land area of all of the Lots, if such extension, duly executed by the aforesaid Lot owners, is recorded before the expiration of the aforesaid twenty (20) years or the specified extension term if less than twenty (20) years."[4]  On July 18, 2002, an extension of the agreement was duly recorded.

---

[4] The owners also added a provision prohibiting further subdivision of any lot in any manner.

A group of neighbors commenced an action seeking to enforce the restrictions against 2 Wyndcliff, LLC, and the trustee of the Robert H. Batts, Jr., family trust.  The latter two entities commenced their own action seeking a declaration that the restrictions expired on March 26, 2010.  The separate cases have been treated as companion cases; we refer to the parties using the same nomenclature the Land Court judge used:  the parties seeking to enforce the restrictions are designated "the neighbors," and the parties asserting the restrictions have expired are "the owners."  The parties filed cross motions for summary judgment, and the judge granted the owners' motion.  The judge reasoned that, even assuming that two-thirds of the neighbors could amend the agreement to provide for extensions of the period of enforcement, the mechanism the neighbors chose failed to achieve its desired purpose.  He concluded that the amendment in effect transformed the agreement to one "unlimited in time" and that, because under G. L. c. 184, § 23, restrictions unlimited in time expire after thirty years and cannot be "renewed," the agreement terminated on March 26, 2010. The neighbors appeal.

Discussion.  Restrictions on land are generally disfavored, and the Legislature has established procedures through G. L. c. 184, §§ 26-30, "by which a landowner may 'remove or prevent the enforcement of obsolete, uncertain or unenforceable

restrictions.'" Stop & Shop Supermkt. Co. v. Urstadt Biddle Properties, Inc., 433 Mass. 285, 290 (2001) (Stop & Shop), quoting from Labounty v. Vickers, 352 Mass 337, 348 (1967). At the same time, the Legislature has not precluded landowners from "bargaining for, and enforcing, beneficial land use restrictions that contain a lengthy, but definite term of duration." Stop & Shop, supra. "There is no superseding public policy between the somewhat differing general principles that, on the one hand, disfavor land use restrictions, and, on the other hand, uphold contractually bargained for restrictions that permit landowners to use their land in certain ways." Id. at 292.

One method the Legislature has employed to address these competing interests is to limit enforcement of restrictions to thirty years generally and, while freely allowing longer durations, requiring landowners to comply with certain specific steps should they desire to impose restrictions lasting more than thirty years. Id. at 290. Thus, since 1887, where land use restrictions contained no durational limit, Massachusetts law has imposed a thirty-year time limitation on them. See G. L. c. 184, § 23; Stop & Shop, supra at 288; Jones v. Murphy, 60 Mass. App. Ct. 1, 3 (2003).[5]

---

[5] In addition to durational limitations, the Legislature has enacted G. L. c. 184, § 30, inserted by St. 1961, c. 448, § 1, through which landowners may prevent enforcement of restrictions that are not of "actual and substantial benefit" to a person

Even restrictions that contain an express durational limitation in excess of thirty years may not be enforced for more than thirty years unless certain steps are taken.  It is undisputed that the restrictions at issue were imposed as part of a common scheme.  General Laws c. 184, § 27, distinguishing restrictions imposed as part of a common scheme from those that are not, provides in pertinent part:

> "No restriction imposed after December [31, 1961,] shall be enforceable . . . (b) after thirty years from the imposition of the restriction, unless (1) the restriction is imposed as part of a common scheme applicable to four or more parcels . . . and provision is made in the instrument or instruments imposing it for extension for further periods of not more than twenty years at a time by owners of record, at the time of recording of the extension, of fifty per cent or more of the restricted area in which the subject parcel is located, and an extension in accordance with such provision is recorded before the expiration of the thirty years or earlier date of termination specified in the instrument . . . ."

Ibid., inserted by St. 1961, c. 448, § 1.

The neighbors contend that by the fourth amendment, they brought the agreement into compliance with § 27(b)(1) and that

---

claiming rights of enforcement.  Section 30 contains a presumption that restrictions in certain circumstances are not of substantial benefit, but that presumption does not apply to common scheme restrictions.  See St. 1979, c. 307.  The statute does provide criteria for determining whether common scheme restrictions remain enforceable, however, including, among others, whether continuation of the restriction would "impede reasonable use of land for purposes for which it is most suitable, and would tend to impair the growth of the neighborhood or municipality in a manner inconsistent with the public interest or to contribute to deterioration of properties or to result in decadent or substandard areas or blighted open areas."

they extended the restrictions by filing an extension before the expiration date contained in the original agreement and the fourth amendment. The judge assumed, without deciding, that the neighbors could amend the agreement, which originally did not provide for extensions, to allow extensions, and went on to analyze the effectiveness of the fourth amendment. Because we conclude that pursuant to the terms of the statute, in order to impose a restriction for more than thirty years, the instrument originally creating the restriction had to include a provision for extensions, we need not reach the issue of the effectiveness of the fourth amendment.

"The statute is to be construed as written, in keeping with its plain meaning," giving "some effect to each word." Stop & Shop, supra at 289. The statute expressly specifies that the provision for extensions must be contained in the original instrument that created the restriction. Where extension provisions are not contained in the original instrument, the statutory scheme does not allow subsequent amendments to add new provisions for extensions. Here, the original 1980 document imposing the restrictions set a thirty-year time limit for the restrictions and allowed for amendments during that term by a vote of two-thirds of the owners. Everyone in possession or coming into possession of one of the lots subject to the agreement after 1980 would be on notice that their property was

subject to the control of a vote of two-thirds of the other common-scheme property owners. However, they also took possession with the understanding that this control over their property by a vote of two-thirds of the other property owners would end in thirty years. In contrast, the amendment at issue here, if valid, would allow a group of two-thirds of the property owners (if they also owned fifty percent of the other common-scheme land) to potentially extend the restrictions indefinitely by successive twenty-year increments; that is not what owners agreed to when they bought common-scheme property. Section 27(b), by limiting the enforceability of a common-scheme restriction after thirty years only where "provision is made in the instrument or instruments imposing it for extension for further periods of not more than twenty years at a time," ensures that, after thirty years, no owner is bound by a restriction unless that owner, whenever he or she bought the lot in question, expressly agreed to the mechanism by which the restrictions could be extended. Accordingly, the mechanism for the extension of the restrictive covenants must explicitly be in the original document, and cannot be added by a later vote (even a majority vote) of less than the agreement of one hundred percent of all property owners in the common scheme. "[E]xtension is possible only if the creating instrument provides for it . . . ." Mendler, Massachusetts Conveyancers'

Handbook § 15:14, at 378 (4th ed. 2008).  Because the amendment to add a provision for restrictions is unenforceable, we conclude that the restrictions at issue terminated on March 26, 2010, as provided in the original agreement.

Our conclusion is buttressed by review of the various statutory provisions applicable to restrictions.  The statutory scheme was enacted on May 10, 1961.  St. 1961, c. 448, § 1. Section 28 applies to restrictions imposed before January 1, 1962, and does not include the requirement that a provision for extension be made in the instrument or instruments imposing the restriction.[6]  However, § 27, which applies to restrictions imposed after January 1, 1962, does provide that extension be made in the instrument or instruments imposing the restriction, putting drafters of restrictions on notice of the necessity to include a provision for extensions when drafting restrictions effective after January 1, 1962.  Accordingly, when the restrictions at issue were created in 1980, the requirement that a provision for extension must be included in the original instrument should have been clear.

Judgment affirmed.

---

[6] It would have been impossible to do so retroactively, as those documents had already been drafted and executed.